Spear, J.
The question in the case is, whether the Certificates are certificates of stock or certificates of indebtedness? If jTe_former, then, inasmuch as the company is an Ohio corporation, and itself pays taxes in this state upon its capital stock, these certificates are notjtaxable; if the latter, they aiejaxable as credits.
The relation of a’holder of preferred stock is, in some of its aspects, similar to that of a creditor, but he is not a creditor save as to dividends after the same are declared. Nor does he sustain a dual relation to the corporation. Hé is either a stockholder or a creditor; he cannot, by virtue of the same certificate, be both. If the former, he takes a risk in the concerns of the company, not only as to dividends and a proportion of assets on the dissolution of the compan j, but as to the statutory liability for debts in case the corporation becomes insolvent; *155 if the latter, he takes no interest in the company’s affairs, is not concerned in its property, or profits as such, but his whole right is to receive agreed compensation for the use of the money he furnishes, and the return of the principal when due. Whether he is the one or the other depends upon a proper construction of the contract he holds with the company. It is said that “a mortgage creditor, although denominated a preferred stockholder, is a mortgage creditor nevertheless; and interest is not changed to dividend by calling it a dividend; ” “ the question is not, what did the' parties call it, but what do the facts and circumstances require the court to call it.” The aptness of this language arises in a case where it has been determined that such holder is a creditor; it may not furnish material aid in ascertaining the fact whether he is such or not. However, what the parties in the given ease have called the subject of the contract is of no little significance in determining their purpose, and, when that purpose is ascertained, it is of much importance in giving construction to the contract. The object of all rules of construction is to arrive at the meaning of the parties. What was the object to be accomplished ? What did the parties intend, and are the means taken in harmony with that intent, and with the law applicable to the subject ? These are questions addressed to the court in this case, and when answered the case is decided.
As supporting the claim that it was not stock that was issued but certificates of indebtedness, special attention is called in argument to those portions of the certificates which provide that holders shall not vote upon them at any meeting of the holders of the capital stock of the company; that the rights of the holders to the dividends are guaranteed, and are to be secured by mortgage on the property, rights and income; that no further or other mortgage shall thereafter be made to the prejudice of the holders of the preferred stock; that the dividends are guaranteed by The Cincinnati, Hamilton & Dayton company, which company had executed a mortgage to Stanley Matthews, trustee, to secure the payment of dividends.
*156 As to some of these provisions it may be conceded that they are consistent with the idea that a debt was being created, but does it follow that they are inconsistent with the opposite view ? While each part of the contract should be considered by itself, yet the several parts should be construed together, and the intent gathered from a consideration of the whole.
The stockholders of the company undertook to provide means for the. redemption of its bonded debt, under and by virtue of the provisions of the act oFA'prilA6, lSJO^^Their resolution of December 22, 1870, indorsed on the back of the certificates, so declares, and the provisions of the act are thus made, in effect, a part of the certificates themselves. It therefore becomes important, at the outset, to understand what that act contemplated, and what it authorized. The declared purpose, as shown by the title, was “to enable-railroad companies.to.xede,em theirJbonded debts.” To “redeem” is “to purchase back; to regain, as mortgaged property by paying what is due; to receive back by paying the obligation; ” so the means authorized to be provided by the act were to be used to enable railroad companies, not to exchange one form of security for another, but to fay their bonded debts, and this object was to be accomplished under the act by.the issue of stock. This is apparent because: (1) the term stock is used, and no term inconsistent with that word is used to describe what may be issued; (2) the action of the stockholders, is to be invoked to determine whether stock, and stock alone, shall, or shall not be issued; (3) dividends are provided for, and not interest; (4) payment of such dividends is limited to the surplus profits; and (5) because the abstract required, which is to show, by copies, the time for which, and the papers in which, notice of the stockholders’ meeting was given, and to show the total amount of the pre-existing stock and the amount of the preferred stock authorized, and is to have attached the affidavit of the president and secretary, is to be filed in the office of the secretary of state, the office which, by general law, is the designated place for the filing of all certificates of incorpo *157 rations organized within the state, and where the same are to be recorded for the information of the public. These provisions seem entirely inconsistent with the idea that certificates of indebtedness might be issued under this act, and show that the certificates intended to be authorized, and in fact authorized, were certificates of stock only. The action of the stockholders, and the filing of a certificate in the office of the secretary of state, here provided for, are substantially the steps necessary by a corporation to obtain either an increase or decrease of its common stock, (sections 3262, 3264, Rev. Stats.,) and this act but provided a plan for increasing the company’s stock by the issue of preferred stock to enable it to pay off its bonded debt. It was not a scheme for the extension or refunding, of a debt, nor for the paying of an old debt by the incurring, of a new one.
The certificates issued are in the line of this purpose, and their terms are not necessarily inconsistent with it. They purport to be certificates of stock. They certify that the holder is the owner of shares of stock of fifty dollars each; that it is transferable only on the books of the company in person or by attorney on surrender of the certificate; that the stock is issued in pursuance of the act, and provide for payment of dividends upon the stock, but make no provision for the payment of the principal sum advanced. The certificates were the natural sequence following the resolution of December-22,-18.70,indorsed on the back thereof. That resolution in terms assumes to proceed under and by virtue of the provisions of the act. It creates and authorizes the issue of a preferred stock. The shares are to be fifty dollars each, and the dividends thereon are to be payable quarterly at the rate of eight per cent, per annum, on the par or nominal value thereof. It further stipulates that the holders„oltbe certificates of stock shall not have or exercise,The..right to vote, the same at .the meeting of the stockholders of the company, thus indicating that it was stock theyjmtended to authorize the issue, of andmot certificates of- -indebtedness, for. the inhibition against voting would be wholly useless had it been intended that the holders should become creditors. The^grpyisiomis not.unusual. It is some *158 times found in the statute itself. See act of May 5,1877, 74 Ohio L. 183. Nor is it, in this instance unreasonable. The promise to the preferred stockholders was to award them the first net earnings, the holders of the common stock to share in such of the net earnings as they might, by good management, be able to make over and above the eight per cent. As the burden was upon the common stockholders, the power to manage might fairly be left with them. In any view, it is fair to treat the proviso as but an arrangement between two classes of stockholders which did not concern the public. It is true that one characteristic of stock generally is that it can be voted upon. But this is not essential. Indeed, instances may arise where it is good policy to prohibit the voting upon stock. Ryan v. Railway, 10 A. L. Ree. 263; Ex parte Holmes, 5 Cowen, 426; Railway Frog Co. v. Haven, 101 Mass. 398; State v. Hunton, 28 Vt. 594. And the point here is, not whether any question of public policy intervenes to make it improper for the preferred stockholders to possess a right to vote, but whether any such question intervenes to make it imperative that they shall have that right.
Nor did the stipulation guaran.teej.ng to .the holders_of the preferred stock, payment .of dividends^therepn -negative the idea that they were stockholders. Ityvas not a stipulation to pay dividen dslin. any, .event,J?ut_a stipMatinu^o_pj^i^lyAúr OTSúfplus profits, for the company must be presumed to have proceeded in view of the terms of the second section of the act referred to, and the general rule of law on the subject. That rule is that payment of dividends to preferred stockholders differs from such payment to the holders of common stock only in that they are entitled to dividends in priority to any dividends upon the common stock. Dividends to either are to come from one common source, to wit: from funds properly applicable to the payment of dividends, that is to say, net earnings. In the nature of things this must be so. As well might one member of a partnership be permitted to appropriate to his own use assets of the firm to the prejudice of creditors, as for a stockholder of a corporation to do it. A contract to permit this to be done would be contrary to pub *159 lie policy and void. Pierce on Railroads, 124, 125; St. John v. Railway, 22 Wall. 136; Lockhart v. Van Alstyne, 31 Mich. 76; Taft v. Railroad, 8 R. I. 310; Railroad v. King, 17 Ohio St. 534. And now provision to the same effect is made by statute. 1 Smith & Benedict’s Rev. Stats., 935.
It may not be easy to satisfactorily determine whatoffice the mortgage from The Dayton & Michigan Company to-holders of tire certificates to secure payment of dividends was expected to .perform, inasmuch as those holders, if stockholders, could not thereby be given priority over creditors, either then existing or those who became such afterwards. However, this consideration is hardly a sufficient reason for concluding that the giving of the mortgage implied a purpose to change the apparent status of the holders, though not entirely inconsistent with such purpose. If in giving it, the intention was to treat the holders as creditors, we are at a loss to account for the absence of any provision fixing a definite time when the debtjKQprd’SpiireCand the creditors have a right to enforce a return of the principal sum advanced. And though the strixment, regarded.as made to_stoc_kholders,,was ineffectual to accomplish the most, usual purpose of a mortgage, yet it does not follow that it was a vain thing, especially when considered in connection with the agreement against the execution of a further mortgage. The Dayton & Michigan Company’s road having been leased, and being then in the possession of the lessee, and being operated by it, a contract of record might have been, in the view of the company, important, in order to clearly establish the rights of the new stockholders, and the obligation of the lessee company to them, and for the information of the public, and this might as well be done by mortgage as in any other way. It may be added that so far from being inconsistent with the idea of an issue of stock, it is directly in line with it, inasmuch as preferred stock is itself a form of mortgage: 2 Redfield on Railways, sec. 237.
As to the guaranty of The Cincinnati, Hamilton & Dayton Company, had it been absolute and unconditional, it is difficult to see how it could change the character of the issue, or *160 be antagonistic to tbe general purpose expressed by the certificates. But its agreement with the preferred stockholders was, at best, only a collateral undertaking, and could not rise higher, in obligation, than the original.
The stipulation that no mortgage should thereafter be made to the prejudice of the holders of the preferred stock, does not, under the circumstances, seem out of harmony with the general purpose. The proceeds from the disposition of the preferred stock was expected to relieve the company of its mortgage debts, and as its road was being operated by a lessee, the incurring of general debts or expenses would not be necessary. In such case a stipulation against further mortgage debts would not be without its use inasmuch as it would tend to give added value to the certificates in the market; nor would it be, from any standpoint, inconsistent with the end to be accomplished. At all events it was clearly a matter concerning which the parties interested might, as stockholders, lawfully contract. Besides, this provision, as it seems to us, indicates that it was intended to treat these holders as stockholders rather than creditors, for, if they were the latter, the lien of their debts was to be fully secured by the mortgage, and no subsequent mortgage could prejudice them; while if simply stockholders, though entitled to a preference, the company might so encumber its property by subsequent mortgages, as to make payment of preferred dividends impossible. And no reason is perceived why this agreement might not, with propriety, be carried into a mortgage, if made to preferred stockholders, though it might.excite surprise if found in a mortgage to creditors, for a covenant in a mortgage, executed to secure payment of a debt, that the debtor would never give another mortgage on the same property, would be an anomaly.
To construe the act of April 16., 1870, as authorizing the issue of the certificates of indebtedness, in the guise of stock, would be to impute to the general assembly that enacted it bad faith, which is not permissible; and to hold that the stockholders, by their resolution of December 22, 1870, and the company, by the certificates issued on the authority of *161 that resolution, intended to issue evidences of debt, though in the form of certificates of stock, is to convict the parties of an attempt to obtain property under false pretenses; for if stock was issued which, in law, became part of the capital stock of the company, the power to issue it was undoubted, and, being non-taxable, was likely to prove of high value in the market, and to so continue as long as the company’s affairs were pros? perous; while if certificates of debt were issued, they were of much less value because of being taxable in this state the same as other credits, and because of a doubt as to the power of the company to issue certificates in the amount and bearing the rate of increase authorized by the resolution. A court will hesitate long before making so damaging, and, under the circumstances, so improbable an imputation. The conclusion seems clear, that the purpose was to issue stock and not evidences of debt. It also seems that the purpose was not inaptly expressed in the form of certificate adopted and issued, and that to justify a holding which will defeat that purpose, a court should be fully satisfied that, treating the transaction as a whole, a debt was, in fact, created.
But it is further objected that the issue cannot be treated as an issue of stock because additional provisons to be found in the lease and in the mortgage, taken in connection with the provision in the certificates against voting, and for the giving of a mortgage by each of the companies, stamp the certificates with a rate of dividends as an absolute and continuing obligation, payable in any event; and hence, notwithstanding that the issue of stock is authorized by the act, and that the word stock is used to describe the issue in the • certificates, they are in reality certificates of indebtedness; that otherwise there would have been no object in inserting the above provisions in the certificates, or in executing the mortgage.
To these objections, so far as not hereinbefore considered, it may be answered, that the stipulation of The Cincinnati, Hamilton & Dayton Company to pay the dividends on the preferred stock in the lease is an undertaking wholly between the two railroad companies, and there is no proviso in the *162 mortgage by that company that it will pay such dividends independent of the agreement of The Dayton & Michigan Company to pay. On the contrary, the covenant is, that the former company promises that the latter will and does guarantee to the holders of the shares of the preferred stock, as and when they become due, according to the terms of the certificates thereof, the payment of the dividends thereon, and the right to enter upon and sell by the trustee is upon like condition. Here is not, then, an agreement with the preferred stockholder by The Cincinnati, Hamilton & Dayton Company to pay dividends in any event, but only that The Dayton & Michigan Company shall pay the same as and when they become' due, according to the terms of the certificates. This, as we have already found, means payment out of net earnings, and not otherwise. It seems plain, then, that this provision of the mortgage, in no way enlarges the obligations of either company to the holders of the preferred stock.
The authority given by the mortgage to the trustee, in case of default, to enter into possession and operate the road, would, as between the preferred stockholders and the holders of the common stock, amount to no more than an assumption of control by the former by reason of the inability of the latter to so manage the business as to comply with the company’s agreement to pay dividends to those entitled out of the net earnings, a proceeding which would be neither unjust nor illegal, and affords, as we think, no ground for assuming that the stock was thereby converted into a debt. The option to foreclose given to the trustee was but a mode provided-for the winding up of the affairs of an insolvent corporation .in place of the ordinary way, by authority of a court of equity, on petition of stockholders, through the agency of a receiver; while the power to distribute proceeds first to the preferred stockholders to the amount due as dividends and then the face value of stock after satisfying prior lawful charges, was an arrangement which stockholders, as between themselves, were competent to make, and which might, with as great propriety, be made between stock *163 holders as between company and creditors. Any question arising upon this provision would concern only, and be settled . between, stockholders of the two classes. While, in the absence of statutory provision, or agreement otherwise, the preferred shareholder, in the distribution upon a dissolution of the corporation, becomes a common shareholder, yet when a preference as to capital has been expressly contracted for, it is otherwise. Cook’s Stock, etc., section 278; McGregor v. Ins. Co., 33 N. J. Eq. 181. In this view, the term “ prior lawful charges ” will be held as not here used in any technical sense, or importing legal liens upon the property and franchises of the company, but rather in the general acceptation of equitable claims, which, proper steps being taken therefor, may be charged thereon. As against stockholders, general debts of the company may be treated as lawful charges to be paid from the assets prior to distribution among stockholders.
The proviso in the mortgage for the sale or exchange of the certificates at such rate, that the total amount of the dividends should never exceed, in the aggregate, the aggregate interest at that time (Dec. 22, 1870,) payable on the outstanding mortgage bonds, seems upon its face, to afford some ground for the claim of counsel that it was made in order to limit the issue so as to bring it within corporate capacity to pay interest, i. e. within the limit to which, by section 3287, Revised Statutes, railroad companies are confined in agreements for interest on bonded debts, and the farther claim that this points to the conclusion that the certificates were really intended for and understood to be certificates of indebtedness. But we can hardly give to this provision the importance claimed' for it by the learned counsel, and it is our duty to reconcile it with the avowed purpose, construed in the light of the other parts of the transaction, if this can reasonably be done. It may fairly be supposed that the rate of dividend (eight per cent.), was adopted to attract purchasers and induce the holders of seven per cent, bonds to take the certificates in payment, and then, in order that the burden which at that time rested upon the lessee company, by reason of the *164 lease, to pay the interest on the bonded debt, should not be increased, the provision was made that the dividends should not exceed, in the aggregate, the aggregate interest on the' bonds. At least this explanation seems reasonable. Even if it be conceded that this clause is not consistent with the expressed purpose of the resolution of the stockholders as to some of its features, that. concession but raises the question which of two or more inconsistent clauses shall prevail. This proviso, in conjunction with the one giving authority to enter into possession and operate the road, and to foreclose and distribute proceeds to preferred stockholders, and other circumstances referred to, may be evidence of a loan, but of themselves are not, we think, of sufficient weight to warrant the conclusion that, that which purports to be stock is not really stock.
We would be content to rest the decision on the foregoing. But, in addition, it may be suggested, arguendo, whether, if the contention of counsel is correct, this entire transaction was not unwarranted in law. Such an interpretation should not be accepted if it can fairly be avoided. It is a recognized rule of construction that where a contract is susceptible of two constructions, one of which would make it legal and valid, and the other illegal or invalid, preference will be given to the former, and the contract construed, if possible, so as to make it lawful, reasonable, and operative. This company was organized under a special act passed March 5, 1851, by which its authorized capital was placed at $3,000,000. As to its power to execute mortgages it was governed by the provisions of the act of February 11,1848, which gave authority to borrow money not exceeding its authorized capital, and pledge the property and income of the corporation, limiting the rate of interest to seven per cent, per annum, and the form of indebtedness to that of bonds and promissory notes. Now, the project, as we have seen, contemplates an issue of $3,700,000, a sum much in excess of the authorized capital, and in the form of certificates of preferred stock. Under the act of April 16,1870, this might lawfully be done, but if the claim of counsel be correct, how can we escape the conclusion that the whole *165 transaction, being not only unauthorized by the charter, but in direct violation of its terms, was beyond corporate capacity, and invalid ? The corporation itself would doubtless be es-topped to deny its validity because it had received and been benefited by the creditor’s money, and probably the common stockholders because of ratification and acquiescence. But, in case an issue should arise between subsequent creditors holding claims founded upon transactions clearly within the corporate powers and those relying upon the contract beyond its powers, it would seem clear that the former claim would be preferred, and the latter, for the reasons stated, held to be invalid. And, without doubt, the circumstances would justify the attorney general, in the name of the state, in instituting proceeding in quo warranto against the corporation.
By the recitals in the mortgage it appears that, at the date of that instrument, the bonded debt of The Dayton & Michigan Company exceeded the amount of its authorized capital stock. How this was brought about we are not concerned to inquire. That it was so may have afforded a powerful motive inducing the company to take effective means to redeem the bonded debt, and thus relieve the company and its creditors of the embarrassment incident to that situation.
But whether the construction we incline to place upon this mortgage is correct or not, the result, we think, must be the same. Of more importance than the construction of the provisions of the mortgage, or the determination of whether or not those provisions are, in all particulars, at one with the language of the certificates, is the controlling consideration, paramount to all others, that the expressed purpose and object of this transaction was to pay a bonded mortgage deb,t by the issue of stock under a law which gave unquestioned authority for such issue. The power given by the stockholders was to execute a mortgage in pursuance of the resolution, and not inconsistent with the act. The company held out to the world that it was proceeding under that resolution and within the terms of the statute. If there is irreconcilable difference between the certificate and resolution, and the mortgage (which we think there is not), the *166 latter must give way, and the former be held to control. The incident cannot overbear the principal.
It is urged that preferred stock is not capital stock within the meaning of the section (2746 Rev. Stats.), which authorizes the holders of shares of the capital stock of any company the capital stock of which is taxed in the name of the company to omit such shares from their tax return, and hence is not exempted from that section. It is true that the funds arising from the sale of the certificates did not enter into the original purchase of the property which the corporation itself was required to list for taxation. But the property of the corporation was pledged for payment of the bonded debt, and, in a sense, that debt reduced the value of the property. This debt was, to the extent that the preferred stock was disposed of, wiped out by exchange for, or the proceeds of the certificates, and the company’s interest in the property was rendered, by that amount, more valuable. The same result, in the contemplation of the statute, was reached as though there had been an increase of the common stock, and the funds thus acquired, had been applied in discharge of the bonded debt.
We do not question that the rule of exemption is to be strictly construed, but where the purpose authorized, and the purpose declared, is an issue of stock, and not -the creation of a debt, the proof that such purpose has failed and that a debt has, after all, been created, should be clear and convincing. In this case, to our minds, it is not so. We are of opinion that, under the facts and circumstances of the case, these cértificates are certificates of preferred stock, and not certificates of indebtedness; that they are shares of the capital stock of The Dayton & Michigan Railroad Company, and that, inasmuch as the company pays taxes in this state on its property, the shares are exempt from taxation.
The cross-petition will be ordered dismissed, and judg ment rendered for plaintiff.

Judgment accordingly.